## In re SARGENT.
## SARGENT v. SPRY.

No. 15589—Opinion Filed Sept. 15, 1925.

(Syllabus.)

### Appeal and Error—Review—Sufficiency of Evidence.

Where the only error urged, on appeal, is that the evidence is not sufficient to sustain the judgment, this court will examine the record, and if there is any evidence tending to reasonably support the judgment, the same will be affirmed.

(Syllabus by Threadgill, C.)

Commissioners' Opinion, Division No. 3.

Error from District Court, Muskogee County; O. H. Searcy, Judge.

Action by Alene Spry, as petitioner, against Ray L. Sargent, as respondent, for possession of Raymond Sargent, a minor. Judgment for petitioner, and respondent appeals. Affirmed.

C. A. Summers, for plaintiff in error.

Leahy & Brewster, for defendant in error.

Opinion by THREADGILL, C. This was an action of habeas corpus brought by Alene Spry, January 26, 1924, against Ray L. Sargent, for the possession and control of Raymond Sargent, a minor, of the age of nine years. The parties were residents of Muskogee. The petitioner had been the wife of the respondent; they were married August 27, 1913, in Kansas City, and lived in Parsons, Kan., until they separated in 1918. They were divorced by the Kansas court January 10, 1919, and the child was awarded to the father. He filed the petition and she made no appearance. She was in Texas at the time the decree was granted; she worked in Muskogee during the fall of 1918 and 1919 and up to April 7, 1920, when she married J. M. Spry, a conductor of the Kansas, Oklahoma & Gulf Railroad Company. The respondent was a plumber in the employ of the Missouri, Kansas & Texas Railroad Company, and he remarried in the spring of 1922, and removed to Muskogee in 1923, and had with him the boy, Raymond, wife, and an infant daughter. The petitioner claimed the right to the possession of Raymond on the ground that he was her son

and that he had been neglected by his father materially and morally since he was awarded to him by the Kansas court; that he had not had proper and fit clothes to wear nor food to eat; that he had not been surrounded with proper influences conducive to the proper upbringing of the child; that respondent had remarried and had a child of a few months of age; that he had by false and malicious statements as to the character and conduct of the petitioner, poisoned the mind of the child against her as his mother, and, by such statements, had weened the affections of said child from his mother, and on account of these facts he is not entitled to have the custody of the child. She stated that she was the wife of J. M. Spry; that she had a good home; that her husband earns a salary of about $250 a month; that they have no children and are able to take good care of said child, educate him, bring him under moral influences, and make him a good citizen. The writ was issued and served, and respondent answered same, but alleged he was awarded the child by a decree of the court. He denied the allegations of neglect and unfitness to have the care and control of the child, as stated by the petitioner, and he stated that she was not a proper person to have the child on account of her immoral conduct and unsuitable temperament; he further stated that the husband of the petitioner was an unfit person to have the care of the child as a stepfather; that he was divorced from a wife and was ordered to pay alimony for support of his child by her and had failed to do so. He stated further that he had a comfortable home in Muskogee, and the child was comfortably provided for, and was attending the public school, and that he desired to keep him and bring him up properly and educate him and make him a good citizen. The cause was tried to the court and judgment was rendered for the petitioner, and the respondent has appealed to this court, asking for a reversal of the judgment. The only contention urged is that the evidence is not sufficient to sustain the judgment.

The court in trying the case allowed the evidence on both sides to take a wide range. The petitioner was permitted to tell something of her married life with the respondent. She had some grievances against him, the principal of which was that he failed to provide her a home and support; that while she was in the hospital in 1918, he left her and entered the army as a volunteer. She admitted that he awarded her $15 a month out of his allowance as a soldier,

and the government awarded her $25, making her $40 by reason of his going to the army. She said he left debts she had to pay. They had moved into a house to themselves and bought furniture on the installment plan and she had to pay the installments. The money provided for her was not enough to support her and the child and she could not find suitable employment in Parsons, Kan., where they lived, and she went to Muskogee to work. She took the child with her, but he was such an incumbrance to her employment that it was necessary for her to place him in a nursery or send him to her husband's mother in Parsons, Kan., and she chose the latter course, by the consent of the mother, and paid her $4 a week for taking care of the child, and she made frequent visits to see him. She worked in Muskogee for 30 days as cashier at the Katy restaurant, she was P. B. X. operator at the Severs Hotel for three months, and clerked at Kress' three or four months, and was helper to Dr. Nagle for nine months. On cross-examination she stated that a part of the time in Muskogee she roomed at the home of her present husband's mother and met him there in 1919, and they married in the spring of 1920.

On the principal issues in the case, petitioner introduced evidence tending to show that the respondent brought the child to see her several times from the spring of 1920 to the end of 1922, and when he would come he always showed that he had been ill-kept, his person showed lack of bathing, and his clothes would be dirty and worn, and she would bathe him and get him clean new clothes. There were pictures introduced showing him to be the playmate of a negro boy, and the grandmother who kept him admitted that he sometimes played with the negro boy. There was evidence by the petitioner that the child had not been guarded against some sexual propensity, which was becoming a habit, and which was injurious and degrading to him, and when she mentioned this to the respondent he treated it lightly. There was also evidence tending to show that during the year of 1923, the respondent was very reluctant in permitting the child to see his mother, and that he was teaching the child that the mother was a bad woman, and if he stayed with her, that she would beat him and treat him with harshness. There was evidence of the mother's great anxiety over the child and solicitude for his welfare. She was permitted to keep him, and one time several months, and sent him to school, during which time she had to place him in the

hospital and have him operated on for his enlarged tonsils and adenoids. She attended him in the operation and nursed him, and she was ever begging for his visits and planning for his future. When she married the present husband, her first solicitude was for her child, and she went to see him and begged for him to live with her in her new home. The evidence showed that her husband, Mr. Spry, desired to favor her in all her plans for the child.

It is true the respondent denied the most of this evidence. He introduced testimony tending to show that the child was not neglected and that his clothes were always suitable for his comfort and that the dirt spoken of by the petitioner was only such dust and dirt as would settle on the child in traveling from Parsons, Kan., to Muskogee, and that since his marriage in the spring of 1922, his wife had taken good care of him, and he had a comfortable home for him in Muskogee, and he was well able to make him comfortable and happy, and his wife was willing to assist him in every way she could. If respondent had stopped with this evidence and had gone no further, it might be a close question as to whether or not the petitioner's evidence was sufficient to reasonably support the judgment, but it appears from the record that he did not stop with evidence tending to deny the charges of the petitioner against him, but went further and offered evidence to prove that the petitioner was a bad woman. He said she was in the hospital in Parsons, Kan., at the time he went to the army, from being too "intimate with a quack doctor." He introduced a letter dated March 24, 1919, which he said he took from her on a visit to see her in Muskogee after his return from the army. He said she gave him the letter and then tried to get it from him, and he refused to give it up and they had trouble over it in the hotel. The copy of this letter appears in the record and is very incriminating. She was asked on cross-examination to identify the letter, but she denied having it in her possession, and said she knew nothing of it. He introduced the evidence of a woman who stated she knew the petitioner when she lived at a certain rooming house in Muskogee, and this woman could tell nothing definite as to her conduct, but insinuated that she was a bad woman, and this fact was well known at the rooming house. There was also evidence to show that J. M. Spry, petitioner's husband, had been divorced by his wife by a court in Oklahoma City and alimony was awarded against him to support the child in the

case, and he had failed to pay the same. There was evidence to show that the petitioner had divorced her first husband before she married the respondent.

Counsel lay a great deal of stress upon the evidence that the petitioner was a lewd woman and that her husband failed to pay alimony, in support of their contention that the petitioner was an unfit person to have possession of the child and the home was an unfit place for the child to live in and his support there would be very uncertain. It occurs to this court that all this evidence tending to blacken the name of this woman is unworthy of the least credit, nor do we think there is any merit in the argument that because J. M. Spry failed to pay alimony, under the circumstances disclosed by the evidence on that question, he would fail to provide a home and support for his wife and her son. When we read the record we find that when the respondent returned from the army, he went to see the petitioner and wanted her to live with him as his wife and she refused. She testifies to this and he does not deny it, but admits that he expected her to live with him. He permitted the child to visit her, and his mother expressed the hope and desire that they would go back together. When he brought his action for divorce he made no charge of immorality against her. When he married in 1922, he took his wife on their wedding trip to see her and her husband, and his mother visited her, and the child was permitted to go to see her, and the respondent would take the child from Parsons, Kan., to Muskogee to see her, and the child would stay several days at a time and even weeks and months. These facts are undisputed and we must say they are inconsistent with the respondent's present attitude and contention, that this woman and mother of his child and former wife was a bad woman, and that although she has been married to Spry since 1921, she is still unfit to have possession of this child. We think the trial court was fully justified in discrediting all this evidence tending to slander and blacken the name of this woman. We cannot understand how the respondent could claim that he loved his child, and desired to have him grow up to be a good man and a useful citizen, and at the same time teach him that his mother was a bad woman and unworthy of his respect and love. We conceive of no greater injury to this child, and if the father had done nothing else to render him unworthy of the confidence of the court and possession of the child, this would be sufficient. If he

had been blameless in taking care of his child until this case came before the court, his acts here, in the light of this record, would be sufficient to authorize the court in taking the child from him and placing him in the care of the mother, that he might have an opportunity to learn that his mother loves him and is worthy of his respect and of his love. If this record showed a different state of facts as to the attitude of the respondent, when they ceased to live together, if he had left her and taken the child with him, because she was too intimate with a quack doctor, if he had refused to live with her or allow the child to see her after he returned from the army or after the letter episode, and if he had not gone to see her and her husband in their home and taken his wife to see them, nor permitted the child to see her after she married Mr. Spry, and if he had made her infidelity a ground of divorce, when he brought this action, then there would be some excuse for his attitude toward her in the present case, and we would be disposed to praise him as a good father, but as it is, we do not believe this defense is in good faith and for the protection of the child alone.

What greater wrong could the father perpetrate upon his son of nine years than to denounce his mother as a bad woman, unless it would be to allow his son to visit her and associate with her, knowing that she was immoral? And in either case the respondent had mistreated this child and forfeited all right to his respect. Better by far for the child and his country that he be reared poor, under the roof of a cabin, in the keeping of a good mother, one he can love and honor, one he can boast of and fight for, and if need be, die for, than be reared in affluence without the guiding hand of such a mother.

We think the judgment of the trial court should be affirmed.

By the Court: It is so ordered.

Note.—See under (1) 4 C. J. p. 879, § 2853. 2 R. C. L. p. 194; 1 R. C. L. Supp. p. 433; 4 R. C. L. Supp. 90, 5 R. C. L. Supp. p. 79.